UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RAYMOND WIERZBIC, BERNICE WIERZBIC,
BRIAN WIERZBIC, and ANGELENE WIERZBIC,

                                  Plaintiff,

           v.

ERIE COUNTY SHERIFF TIMOTHY HOWARD,
DEPUTY ERIE COUNTY SHERIFF MICHAEL HOOCK,
DEPUTY ERIE COUNTY SHERIFF JASON WEISS,
DEPUTY ERIE COUNTY SHERIFF THOMAS WAS, and
DEPUTY ERIE COUNTY SHERIFF JAMES FLOWERS,

                                Defendants.
_____

DECISION
and
ORDER

13-CV-978F

APPEARANCES:       PAUL E. FALLON, ESQ.
                        Attorney for Plaintiffs
                        57 High Park Boulevard
                        Amherst, New York  14226

                        DAIRE BRIAN IRWIN, ESQ.
                        Attorney for Plaintiffs
                        210 Voorhees Avenue
                        Buffalo, New York  14214

                        LIPPES MATHIAS WEXLER FRIEDMAN LLP
                        Attorneys for Defendants
                        JENNIFER C. PERSICO,
                        ERIC MICHAEL SOEHNLEIN, and
                        JAMES PETER BLENK, of Counsel
                        50 Fountain Plaza
                        Suite 1700
                        Buffalo, New York  14202

## **JURISDICTION**

On April 20, 2018, the parties to this action consented pursuant to 28 U.S.C. §

636(c) to proceed before the undersigned.  (Dkt. 101).  The matter is presently before

the court on Defendants' motion for judgment as a matter of law (Dkt. 136), filed

December 11, 2018, and on motions *in limine*, filed on November 1, 2018, by Defendants (Dkt. 115), and on November 2, 2018, by Plaintiff (Dkt. 118), and Defendants (Dkt. 119).

## BACKGROUND

Plaintiffs Raymond Wierzbic ("Raymond"), his wife Bernice Wierzbic ("Bernice"), their son Brian Wierzbic ("Brian"), and their daughter Angelene Wierzbic ("Angelene"), commenced this by filing on September 27, 2013, the Complaint, pursuant to 42 U.S.C. § 1983, against Defendants County of Erie ("County"), Erie County Sheriff's Department ("Sheriff's Department"), Erie County Sheriff Timothy Howard ("Sheriff Howard"), Erie County Deputy Sheriffs Michael Hoock ("Deputy Hoock"), Jason Weiss ("Deputy Weiss"), Thomas Was ("Deputy Was"), and James Flowers ("Deputy Flowers") (together, "County Defendants"), and the East Aurora Police Department ("East Aurora Police"), East Aurora Police Chief Ronald Krowka ("Police Chief Krowka"), and East Aurora Police Officer Robert Braeuner ("Officer Brauener") (together, "East Aurora Defendants"). The Complaint sets forth federal civil rights claims for (1) excessive force; (2) malicious prosecution; (3) failure to intervene; (4) conspiracy; (5) First Amendment violation; (6) Fifth Amendment violations; (7) false arrest; and (8) false imprisonment, and state law claims for (1) false arrest; (2) false imprisonment; (3) assault; (4) battery; (5) intentional infliction of emotional distress; (6) negligent hiring and retention; and (7) negligent training and supervision. Plaintiffs seek in connection with their claims compensatory damages, punitive damages, and an award of reasonable attorney fees under 42 U.S.C. § 1988.

After discovery was complete, motions for summary judgment were filed by East Aurora Defendants (Dkt. 81) ("East Aurora Defendants' summary judgment motion"), County Defendants (Dkt. 83) ("County Defendants' summary judgment motion"), and Plaintiffs (Dkt. 84) ("Plaintiffs' summary judgment motion").  In a Decision and Order filed January 25, 2018 (Dkt. 98) ("Summary Judgment D&O"), District Judge William M. Skretny granted East Aurora Defendants' summary judgment motion and terminated the East Aurora Defendants as parties, denied Plaintiffs' summary judgment motion, and granted in part and denied in part the County Defendants' summary judgment motion dismissing the County as a party, dismissing all claims against remaining Defendants in their official capacities, dismissing the state law claims against Defendants in their individual capacities except with regard to Defendants Sheriff Howard and Deputy Hoock, dismissing all other claims as against Sheriff Howard, dismissing Plaintiff's First and Fifth Amendment claims, holding no punitive damages claim could be brought against any Defendant in his official capacity, and deeming the Complaint amended to include a New York common law claim for trespass which was could be maintained against only Defendants Sheriff Howard and Deputy Hoock ("Defendants").  Summary Judgment D&O at 32-33.  With regard to the trespass claim, Judge Skretny further found all the necessary elements to hold Deputy Hoock liable for trespass except for sufficient proof that Plaintiff were owners and possessors of the subject premises at the time of the incident.  Summary Judgment D&O at 31-32.

After the parties consented to proceed before the undersigned (Dkt. 101), trial was scheduled with jury selection to commence November 5, 2018 (Dkt. 107). Defendants filed two *in limine* motions including their first, filed November 1, 2018,

seeking an order precluding at trial Plaintiffs from (1) presenting evidence of indemnification of Defendant Deputy Sheriffs, (2) presenting evidence of or referring to the fact that the County was once a Defendant to this action, (3) referring to Defendants' counsel as County Attorneys, and (4) suggesting the jury award a specific dollar amount as damages, (Dkt. 115) ("Defendants' First *In Limine* Motion"), and their second, filed November 2, 2018, seeking a court order allowing Defendants to assert during trial a qualified immunity defense and a justification defense to the state trespass claim. (Dkt. 119) ("Defendants' Second *In Limine* Motion"). On November 2, 2018, Plaintiffs filed an *in limine* motion seeking a court order with regard to the trespass claim that only the question of damages be submitted to the jury with directions the jury can award unlimited damages, and clarifying that Bernice Wierzbic asserted claims for trespass, false arrest, excessive force, malicious prosecution and intentional infliction of emotional distress. (Dkt. 118) ("Plaintiffs' *In Limine* Motion") (collectively, "the *In Limine* Motions").

Trial commenced on November 5, 2018, with the selection of eight jurors, and continued through November 8, 2018, with Plaintiffs calling as witnesses Brian, Raymond, Angelene, and Bernice Wierzbic, and Deputy Hoock, Deputy Flowers, and Deputy Weiss.[1] At the conclusion of Plaintiffs' direct examination of Defendant Deputy Hoock, Plaintiffs moved pursuant to Fed.R.Civ.P. 50(a) for a directed verdict on the New York common law trespass claim, TR3 at 138-49, which the undersigned denied. *Id.* at 152. After the close of all proof, Defendants moved pursuant to Fed.R.Civ.P. 50(a) for judgment as a matter of law on their affirmative defense of qualified immunity, with the

---

[1] References to the November 6, 7, and 8, 2018 trial proceedings are to pages of the specific date's trial transcript, copies of which are filed, respectively, as Dkts. 132 ("TR1 at __")), 133 ("TR2 at __"), and 134 ("TR3 at __").

4

undersigned reserving decision pending the jury's determination on the substantive claims and special interrogatories. Dkt. 135. Prior to submitting the case to the jury, the undersigned, upon Defendants' motion, directed verdict in favor of Defendants on Plaintiffs' malicious prosecution claim, November 9, 2018 Minute Entry (Dkt. 128), Plaintiffs voluntarily withdrew all New York common law claims except for trespass, and all federal claims except for unlawful arrest and excessive force, as well as all claims against Defendants Deputy Flowers, Deputy Weiss, and Deputy Was, leaving only the New York common law trespass claim and the federal civil rights claims for unlawful arrest and excessive force as against only Defendants Deputy Hoock and Sheriff Howard for whom any liability would be in his official capacity and derivative of Deputy Hoock's liability pursuant to the theory of *respondeat superior*.

The jury commenced deliberations on November 9, 2018, and continued on November 13, 2018, when the jury indicated they were deadlocked and unable to reach a verdict on any of the claims as against either Defendant. The court then declared, with the parties' concurrence, a mistrial and dismissed the jury (Dkt. 129).

Intending to retry the case, a pretrial conference to set retrial dates was scheduled first for December 17, 2018 (Dkt. 130), and then adjourned to January 28, 2019 (Dkt. 131), and further adjourned on January 18, 2019 (Dkt. 140), pending resolution of Defendants' instant motion for judgment as a matter of law, filed December 11, 2011 (Dkt. 136) ("Defendants' Rule 50(b) Motion"), attaching the Attorney Affidavit of Jennifer C. Persico, Esq. (Dkt. 136-1) ("Persico Affidavit"), and Defendants' Motion for Judgment as a Matter of Law Pursuant to Rule 50 of the Federal Rules of Civil Procedure (Dkt. 136-2) ("Defendants' Memorandum"). On January 17, 2019, Plaintiffs

filed the Memorandum in Opposition to Defendants' Motion for Rule 50 Judgment (Dkt. 140) ("Plaintiffs' Response").  On February 1, 2019, Defendants filed Defendants' Motion in Reply to Plaintiffs' Opposition to Defendants' Motion for Judgment as a Matter of Law, Pursuant to Rule 50 of the Federal Rules of Civil Procedure (Dkt. 142) ("Defendants' Reply").  Oral argument was deemed unnecessary.

Based on the following, Defendants' Rule 50(b) Motion is GRANTED in part, and DENIED in part; the *In Limine* Motions are DISMISSED as moot.

## **FACTS**[2]

On July 2, 2012, Defendant Deputy Erie County Sheriff Michael Hoock ("Hoock"), was asked by his supervisor for the Erie County Sheriff civil process division, to serve in regard to a collections action against Plaintiff Raymond Wierzbic ("Raymond"), a subpoena *duces tecum* ("the subpoena"), on Raymond.  TR3 at 54-55, 73-75.[3]  Hoock had received training with regard to process serving, including the difference between process serving and trespassing, which could entail violating someone's civil rights, TR3 at 56-67, a subject that is covered in the Erie County Sheriff's Department Civil Process Division's manual, parts of which Hoock testified he has read, TR 57-60, including the provision that there is no way to compel a person to be served to identify himself.  *Id*. at 100-01.  The subpoena contained two addresses for Raymond, including 5734 Burton Road ("the Burton Road address") which was listed as Raymond's business address, and 49 Willis Road ("the Willis Road premises"), which was listed as Raymond's residential address.  TR3 at 76-79.  Because the subpoena was returnable on August 3,

---

[2] Taken from the trial transcript.
[3] The Sheriff's Civil Division, in providing service of process, functions like a private process server by charging a fee for service.

2012, the subpoena did not have to be served until July 23, 2012, yet Hoock decided to serve the subpoena on his way home from work, prior to the start of Hoock's holiday weekend, at the Willis Road premises which was the first address listed on the subpoena. TR 3 at 73-79. Although the subpoena indicated it was to be personally served on Raymond, Hoock confirmed he had the option, under state law, of personally delivering the subpoena either to Raymond, or to someone of suitable age and discretion at Raymond's address as substitute service. *Id.* at 75-78. According to Hoock, when serving civil process, he did not routinely ask the person for proof of ownership of the property, such as a deed, or even for identification but, rather, only for such pedigree information as the person's name, date of birth, address, height, and weight. *Id.* at 77.

Hoock, dressed in his Sheriff uniform complete with his badge and service firearm, traveled during the middle afternoon on Jul 2, 2012, in his Sheriff patrol vehicle to the Willis Road premises. Located on the Willis Road premises were a house, a carport, a barn, some farm equipment including, *inter alia*, a tractor, and fields for planting. A driveway or road led from the roadway of Willis Road through the property past the house, carport, and barn to the fields. Brian, Raymond, and Bernice were at the Willis Road premises preparing to plant 4,000 tomato plants from which they intended to harvest tomatoes to sell at local farmers markets. It was essential that the plants be placed into the ground that day so that they could be watered; otherwise, the plants were likely to perish in the summer heat. Hoock parked the patrol vehicle at the side of the road near the end of the driveway, exited the vehicle and walked up the driveway where Hoock observed two individuals including Brian who walked toward

Hoock, and Raymond who was working nearby on a tractor. TR1 at 113; TR3 at 88-89. Hoock inquired whether Raymond Wierzbic was present, TR3 at 89-90, and Brian Wierzbic ("Brian"), responded that Raymond did not live there, and at least four and possibly five times asked Hoock to give him the papers for Raymond and leave. TR1 at 9-11; TR3 at 91. Hoock did not observe Raymond with any pliers in his hand at that time. *Id.* While Hoock was speaking with Brian, Bernice was close enough to overhear the conversation, but did not think there was any problem and went into the house to use the bathroom and was surprised that Hoock was still there when she emerged from the house a few minutes later. TR3 at 17-20.

Rather than giving Brian the papers and leaving the premises, or just leaving the premises with the papers, Hoock insisted he needed to determine who Raymond was, and demanded to see Brian's identification. Whether Brian provided Hoock with his identification at that time is disputed, but it was not until after Brian had ordered Hoock off the property several times that Hoock observed Raymond, then at the tractor approximately 10 yards away, pick up a pair of large, "Channellock" pliers ("the pliers"), wave the pliers at head-level, shouting for Hoock to leave the property. TR3 at 94. Believing his safety was being threatened, Hoock advised Brian and Raymond they were under arrest, and Raymond stalked off further onto the Willis Road premises, away from Hoock, carrying the pliers, and swearing at Hoock.

Hoock followed Raymond, and Brian followed Hoock, as Raymond, who continued to wave the pliers and yell expletives, led the three about 350 feet deeper onto the property, tossing the pliers into an open toolbox lying on the floor of a barn as he walked past it. Eventually, Hoock increased his speed and caught up to Raymond,

firing a can of pepper spray at Raymond in an attempt to subdue Raymond and gain his compliance. The pepper spray cannister, however, was nearly empty and it is disputed whether Raymond was hit in the face with any of the pepper spray but Raymond became more confrontational and initiated physical contact with Hoock, TR3 at 208-09, and Brian walked toward the house seeking water to wash the pepper spray residue from Raymond, leaving Raymond with Hoock who then engaged in a physical altercation. TR1 at 36, 42, 44, with Brian eventually joining Raymond in the fracas. During the melee, a suggestion was made to call the East Aurora police for assistance, with either Brian or Raymond handing his cell phone to Bernice who was then back outside and standing nearby. The situation calmed a bit while Bernice placed the telephone call, and Brian, Raymond, and Hoock walked back toward the road and stood in the area of the carport, where they soon heard sirens.

Raymond testified that he, Brian and Hoock were standing in the area of the carport at the Willis Road premises, and when the three additional law enforcement officers, including Deputy Sheriff Flowers ("Deputy Flowers"), Deputy Sheriff Weiss ("Deputy Weiss"), and East Aurora Police Officer Braeuner ("Officer Braeuner"), arrived at the scene, Hoock grabbed Raymond by the throat and started punching Raymond in the back, and Raymond, who is huskier than Hoock, responded by flipping Hoock onto his back and using his right arm to place Hoock in a headlock on the ground. TR2 at 129-31, 133. At this point, Bernice entered the fracas, pushing or bumping into Officer Braeuner in an attempt to get him to help Raymond, but Braeuner responded by placing Bernice under arrest.

Meanwhile Hoock and Raymond continued struggling with each other on the ground with Raymond having placed Hoock in a headlock. TR3 at 196, 199. Deputy Weiss was in the process of taking Brian into custody, *id.*, and Hoock observed Deputy Flowers nearby who, in response to Hoock's request, pepper-sprayed Raymond. *Id.* at 196-97. Raymond, in response to the pepper spray, released Hoock from the headlock and complied with the officers, allowing Flowers and Hoock to handcuff Raymond behind his back, using two sets of handcuffs to accommodate Raymond's large arms. TR3 at 203. Because the pepper spray residue continued to create a burning sensation, Hoock used a garden hose, that was not fitted with a spray nozzle, from the nearby tractor to apply water Raymond's forehead and eyes while Hoock also called for an ambulance to bring a decontamination kit to rinse Raymond's eyes of the pepper spray. *Id.* at 200-01. Hoock explained that when applied, water provides relief from the pepper spray, but does not wash away the residue such that as soon as the water is removed, the burning sensation returns. *Id.* at 201-02. Raymond maintains the force of the water in his face resulted in a drowning sensation. TR2 at 154. Meanwhile, Deputy Weiss arrested Brian, and Officer Braeuner arrested Bernice.

Raymond was charged with violations of New York Penal Law ("N.Y. Penal Law") §§ 205.30 (resisting arrest), 195.05 (obstructing government administration), 120.15 (third degree menacing), and 240.26 (second degree harassment). Brian was charged with violations of N.Y. Penal Law §§ 120.001 (third degree assault), 195.05 (obstructing government administration), and 205.30 (resisting arrest). Bernice was charged with violations of N.Y. Penal Law §§ 205.30 (resisting arrest), and 195.05 (obstructing government administration).

Raymond was taken to Erie County Medical Center ("ECMC") for treatment in connection with his complaints of breathing difficulty and blurry vision. AR at 156-57. Meanwhile, Bernice and Brian were transported to the Erie County Sheriff's sub-station at 1600 Bowen Road in Elma ("the sub-station") where, at 6:30 P.M. on July 2, 2012, Hoock served Brian with the subpoena. TR1 at 58-59, 61; TR3 at 108-12, 183. Raymond, Bernice, and Brian were then taken to the Erie County Holding Center ("ECHC"), in Buffalo, New York, where they were held until their arraignment before Aurora Town Justice Jeffrey P. Markello ("Justice Markello"), in Aurora Town Court the following evening, July 3, 2012, and the three were released on bail. On June 12 and 13, 2013, Justice Markello presided over a bench trial, following which Raymond was convicted on all charges, Brian was convicted of obstructing governmental administration, and Bernice was acquitted of all charges. On December 4, 2013, Raymond and Brian each were sentenced to a conditional discharge, fined $ 750, and ordered to perform 20 hours community service. On September 30, 2014, Erie County Court Judge Michael F. Pietruszka ("Judge Pietruszka"), on Raymond and Brian's appeal, reversed the convictions.

## DISCUSSION

### 1.  Remaining Claims

Following Plaintiffs' withdrawal at trial of all claims against formed Defendant Deputies Was, Weiss, and Flowers, as well as most of the state law claims save for trespass, and several federal civil rights claims, left before the court as Defendants are Sheriff Howard and Deputy Hoock. The claims asserted include Plaintiffs' state law claims for trespass, and Plaintiffs Raymond and Brian's federal Fourth Amendment

claims for false arrest and excessive force.  Further, although all Plaintiffs assert their various claims against both Defendants, any liability as against Sheriff Howard, who was not personally involved in any of the alleged unlawful conduct, would necessarily be derivative of unlawful conduct by Deputy Hoock as the Sheriff's employee in a civil matter by virtue of *respondeat superior*.

## 2. Judgment as a Matter of Law

"'Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in his favor.'"  *Stevens v. Rite Aid Corporation*, 851 F.3d 224, 228 (2d Cir. 2017) (quoting *Galdieri-Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)) (brackets omitted).  A rule 50(b) motion may be granted "only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that a reasonable juror would have been compelled to accept the view of the moving party."  *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks and citation omitted).  A Rule 50(b) motion for judgment as a matter of law is decided according to the same standard as a motion for summary judgment under Rule 56(f).  *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (same standard applies to pretrial motion for summary judgment and motion for judgment as a matter of law during or after trial; evidence must be such that a reasonable juror would have been compelled to accept the asserted position).  In ruling on a motion for judgment as a matter of law, "[t]he motion will be granted only if (1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that

reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him." *Noonan v. Midland Capital Corp.*, 453 F.2d 459, 461 (2d Cir. 1972), *cert. denied*, 406 U.S. 945 (1972).

A Rule 50(a) motion made before submission of the case to the jury is a necessary predicate to a post-trial motion pursuant to Rule 50(b),[4] *Bracey v. Board of Education of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004), which essentially is a renewal of a Rule 50(a) motion after an unfavorable verdict on the grounds specifically raised in the Rule 50(a) motion, *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001), and, as such, is "limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]".[5] *Galdieri-Ambrosini*, 136 F.3d at 286. Relief from this specificity requirement is, however, available "where necessary to avoid manifest injustice," and will not be "woodenly appl[ied] merely to attain an unwarranted triumph of form over substance." *Doctor's Associates, Inc. v. Weible*, 92 F.3d 108, 113 (2d Cir. 1996) (internal quotations omitted). Although a Rule 50(b) motion for judgment as a matter of law is decided according to the same standard as a Rule 56(f) summary judgment moiton, *This Is Me, Inc.*, 157 F.3d at 142, a previous denial of summary judgment does not bar the district court from later granting judgment as a matter of law in favor of the summary judgment movant. *Williams v. County of Westchester*, 171 F.3d 98, 102 (2d Cir. 1999) ("*Williams*") (affirming district court's granting Rule 50(b) judgment as a matter of law in favor of same party for whom summary judgment motion was earlier denied). In *Williams*, the Second Circuit explained that a summary judgment decision is

---

[4] Rule 50(a) requires a motion for judgment as a matter of law be made at trial before the case is submitted to the jury and "shall specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed.R.Civ.P. 50(a)(2).

[5] Unless otherwise specified, bracketed material has been added.

interlocutory and, as such, "remain[s] subject to modification or adjustment prior to the entry of a final judgment adjudicating the claims to which they pertain." *Id.* at 102 (citing Fed.R.Civ.P. 54(b) and cases). Accordingly, when presented with a motion for judgment as a matter of law at trial, despite any judicial misgivings about the sufficiency of the evidence to support a verdict, the preferred procedure in the interest of judicial efficiency is to allow the case to be decided by the jury in the first instance and if the court believes the verdict reached by the jury is irrational, *i.e.*, unsupportable given the evidence at trial, the court may then grant judgment as a matter of law. *Id.* Should the matter later be reversed on appeal, the court can efficiently conclude the case simply by reinstating the jury's verdict without any need for retrial. *Id.*

Although in the instant case, the jury did not return a verdict but was deadlocked, judgment as a matter of law has withstood scrutiny by the Second Circuit when granted following a deadlocked trial. *See Noonan*, 453 F.2d at 462-63 (affirming district court's granting judgment as a matter of law in action that was tried before jury twice, both times resulting in a deadlocked jury, determining that the juries' inability to reach a verdict did not mean the actual disagreement preventing a verdict was fair and reasonable based on the evidence presented at trial). Accordingly, that the jury did not reach a verdict on any of Plaintiffs' claims does not preclude granting judgment as a matter of law.

In their instant motion, Defendants assert they are renewing and seeking the same relief as in their trial motion for judgment as a matter of law, Defendants' Memorandum at 3, arguing Defendant Deputy Hoock either was not personally involved in or is qualifiedly immune from liability on both remaining civil rights claims, including

false arrest, *id.* at 4-12, and excessive force, *id.* at 12-18, and with regard to the trespass claims, that Hoock's presence at the Willis Road premises was justified by Hoock's privilege as a process server, *id.* at 19-22, and neither Raymond nor Bernice had a sufficient interest in the subject premises to support their trespass claims as required by New York law. *Id.* at 22-23. In opposition, Plaintiffs argue Deputy Hoock is not entitled to qualified immunity on the false arrest and excessive force claims because it was not reasonable for Hoock to remain at the Willis Road premises once Brian ordered him off, Plaintiffs' Response at 4-9, Hoock was without probable cause to arrest Raymond, *id.* at 9-11, Hoock seized Brian, *id.* at 11-13, and Raymond, *id.* at 13-16, the illegality of the seizures establishes that all force used against Raymond and Brian to effect such arrest was excessive, *id.* at 16, and that the trespass claims should not be dismissed because Defendant Hoock's own trial testimony establishes Hoock should have left the premises as soon as Brian ordered Hoock off the property, *id.* at 16-19, asserting each of the Plaintiffs has a viable trespass claim. *Id.* at 18-23. In further support of their motion, Defendants maintain Plaintiffs fail to reference, as is their burden, any testimony supporting the unlawful seizure claims of Raymond and Brian, Defendants' Reply at 2-3, Plaintiffs confuse the applicable probable cause standard with Defendants' qualified immunity defense pursuant to which Plaintiffs' argument that probable cause to arrest Raymond and Brian was lacking is irrelevant so long as Hoock arguably had probable cause, *id.*, at 4-7, fail to dispute Defendants' asserted facts and arguments regarding the excessive force claims, *id.* at 7-8, and should grant Defendants judgment as a matter of law on the qualified immunity defense because Hoock's status as a process server vested Hoock with a privilege to remain on the

property while attempting to determine the identity of Brian and Raymond to effect proper service of the subpoena, *id.* at 8-9, and both Raymond and Bernice lack standing to assert their trespass claims. *Id.* at 9-10.

### 3. New York Common Law Trespass Claim

Although addressed last by Defendants, the court considers Plaintiffs' claims in chronological order as they arose during the scenario and, thus, begins with the trespass claim. Preliminarily, the court addresses a procedural matter overlooked by the parties. In particular, after Hoock's trial testimony, Plaintiffs moved pursuant to Rule 50(a) for judgment as a matter of law on the New York common law trespass claims, TR3 at 138-49, which the court denied, TR3 at 152, but following trial, Plaintiffs did not renew the motion pursuant to Rule 50(b). Defendants, following close of all proof, moved pursuant to Rule 50(a) for judgment as a matter of law only on their affirmative defense of qualified immunity, on which motion the undersigned reserved decision pending the jury's determination on the substantive claims and special interrogatories, Dkt. 135, *passim*, but because the jury deadlocked on the first claim, *i.e.*, the trespass claim, the jury never reached the other claims nor the special interrogatories that were intended to assist in resolving the qualified immunity affirmative defense. Despite not seeking in connection with their Rule 50(a) motion judgment as a matter of law on Plaintiffs' trespass claim, Defendants, in their instant motion pursuant to Rule 50(b), seek judgment as a matter of law not only on their qualified immunity defense, thus renewing their Rule 50(a) motion made at trial, but also on the New York common law trespass claim on which Defendants did not previously move pursuant to Rule 50(a). Generally, Defendants' failure to include the common law trespass claim in their Rule

50(a) motion would prevent the court from considering the claim with regard to Defendants' Rule 50(b) motion, *Bracey v. Board of Education of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004), which essentially is a renewal of a Rule 50(a) motion, *Lambert v. Genesee Hospital*, 10 F.3d 46, 53-54 (2d Cir. 1993), and, as such, is "limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]". *Galdieri-Ambrosini*, 136 F.3d at 286.   In the instant case, however, Plaintiffs' earlier summary judgment motion was premised solely on their trespass claim, *see* Dkt. 84-10 at 3-5 (Plaintiffs' summary judgment motion memorandum of law), which Defendants opposed on the basis that in neither the Complaint nor in Plaintiffs' interrogatory responses did Plaintiffs mention any trespass claim, *see* Dkt. 89-5 (Defendants' memorandum opposing Plaintiffs' summary judgment motion) at 3-6, and even if such claim had been pleaded, Plaintiffs could not establish it on the merits, *id.* at 7-10, with Judge Skretny holding that although Plaintiffs did not specifically plead a trespass claim, such claim could reasonably be inferred from the Complaint and other papers filed in this action, deeming the Complaint amended to include the trespass claim, Summary Judgment D&O at 26-28, and stating the trespass claim could have been granted in favor of Plaintiffs but for Plaintiffs' failure to prove an essential element of their trespass claim, *i.e.*, ownership and possession of the Willis Road premises.  *Id.* at 31.  Further, Plaintiffs' Rule 50(a) motion was limited to their trespass claim.  TR3 at 138-49.  Nor have Plaintiffs in arguing in opposition to Defendants' Rule 50(b) motion asserted that Defendants' failure to raise the trespass claim in Defendants' prior Rule 50(a) motion bars Defendants from raising it in their instant Rule 50(b) motion.  Significantly, the purpose of requiring a Rule 50(a) movant to articulate the grounds on which the motion

for judgment as a matter of law is sought "'is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'" *Galdieri-Ambrosini*, 136 F.3d at 286 (quoting *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir. 1986)). "'This articulation is necessary . . . so that the responding party may seek to correct any overlooked deficiencies in the proof.'" *Id.* (quoting Fed.R.Civ.P. 50 Advisory Committee Note (1991)). Accordingly, the predicate Rule 50(a) motion "must at least identify the specific element that the defendant contends is insufficiently supported." *Id.* at 286-87 (citing *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1155 (2d Cir. 1994), and *Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir. 1993)). When considering the sufficiency of the Rule 50(a) motion's specificity, the ultimate question for the court is whether the motion by itself, or in the context of the action, sufficiently alerted the opposing party to the supposed deficiencies in proof. *See id.* at 287 (determining that although defendant employer's Rule 50(a) motion did not mention retaliation, defendant's counsel indicated in ensuing colloquy that retaliation claim was included in motion on same grounds as advanced by the defendant employer on the substantive employment discrimination claim).

In the instant case, although the instant Rule 50(b) motion was filed by Defendants, whose own prior Rule 50(a) motion was limited to qualified immunity on the civil rights claims, Plaintiffs' motions pursuant to Rule 50(a) and for summary judgment, were asserted with regard to only their trespass claim, with Defendants' response to summary judgment squarely addressing the merits of such claim, and Judge Skretny declining to grant summary judgment on it only because Plaintiffs had not established ownership and possession of the Willis Road premises as an element for a common law

trespass claim. Under these circumstances, albeit unusual and somewhat procedurally flawed, it cannot be said that addressing the trespass claim in connection with Defendants' Rule 50(b) motion for judgment as a matter of law will result in depriving any party of the opportunity to cure any defect in proof, which is what the renewal concept of Rule 50(b) is intended to avoid, *Gladieri-Ambrosini*, 136 F.3d at 286-87, and is consistent with the direction of Fed.R.Civ.P. 1 ("Rule 1"), that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Simply stated, Plaintiffs' have from the outset been made aware of the deficiencies in Plaintiffs' trespass claim by Defendants' opposition such that Plaintiffs had more than an ample opportunity to provide sufficient evidence to sustain this claim. Accordingly, in ruling on Defendants' Rule 50(b) motion, the court considers whether to grant judgment as a matter of law on Plaintiffs' New York common law trespass claim despite Defendants' failure to include it in their prior Rule 50(a) motion.

Under New York common law, "trespass is an intentional entry onto the property of another without justification or permission." *Woodhull v. Town of Riverhead*, 849 N.Y.S.2d 79, 81 (2d Dep't 2007), *lv. to app. denied*, 889 N.E.2d 80 (N.Y. 2008). An entry may constitute a trespass even if innocently made or by mistake. *Hill v. Raziano*, 880 N.Y.S.2d 173, 175 (2d Dep't 2009) (citing cases). Exceptions to trespass include, *inter alia*, entry for service of process, but even then, a refusal to leave the premises after such privilege is revoked by an owner or someone in lawful possession renders the putative process server a trespasser. *See Rager v. McCloskey*, 111 N.E.2d 214, 216 (N.Y. 1953) (holding complaint alleging defendant deputy sheriff entered plaintiff's

property to serve process and, despite repeated requests, refused to leave upon learning plaintiff was not there, stated claim for common law trespass) (citing Restatement, Torts, § 158; Prosser on Torts, p. 89). Defendants argue that New York courts recognize that the justification or privilege process servers enjoy to serve papers includes "'such force as is necessary to overcome any resistance [met] in the service of the subpoena.'" Defendants' Memorandum at 19 (quoting *Hager v. Danforth*, 20 Barb. 16, 18 (N.Y. Sup. Ct. Gen. Term 1854) ("*Hager*") (holding process server who, uninvited, peacefully enters another's house through an open outer door, is lawfully present at the premises and may use any force necessary to overcome the occupant's resistance to the service)). In *Rager v. McCloskey*, 111 N.E.2d 214, 216-17 (N.Y. 1953) ("*Rager*"), however, the New York Court of Appeals implicitly rejected *Hager*. *Rager*, 111 N.E.2d at 216-17 (citing *Adams v. Rivers*, 11 Barb. 390, 397 (N.Y. Sup. Ct. Gen. Term 1851) ("The defendant had no right to be upon the plaintiff's piazza after he was ordered to depart."); and *People ex rel. Paul v. Warden of City Prison of City of New York*, 74 N.Y.S.2d 438, 439 (N.Y. Sup. Ct. Kings Cty. 1947) (remarking that the door to a house "is a tacit invitation to those who have lawful business" to stand before it, ring the doorbell, and announce themselves, and such persons "are not trespassers and do not become such until they overstay their welcome and ignore a request to leave.")). In *Rager*, the plaintiff, an attorney, brought a claim for trespass against the local sheriff and a deputy sheriff alleging the defendant deputy sheriff, in the course of attempting to serve process on the plaintiff at the plaintiff's law office, entered the law office but, not finding the plaintiff there, and despite repeated requests by other employees to leave, engaged in "violent efforts" including opening doors to the interior offices, forcibly

wrenching apart glass partitions to the typists' room, accompanied by a barrage of profane and abusive language as well as threats of jail if plaintiff's employees did not produce the plaintiff.  *Rager*, 111 N.E.2d at 216.  The defendant deputy ignored the plaintiff's employees' requests to leave, remaining at the law office until he was removed by the police.  *Id.*  Under these circumstances, the Court of Appeals held although the defendant's original entry to serve process may have been lawful, the allegations that despite repeated requests to leave the defendant remained "for a not inconsiderable period" were sufficient to allege a trespass claim both against the defendant deputy, *id.* at 216-17, as well as the defendant sheriff through *respondeat superior.  Id.* at 217.

Similar to the instant case, in *Butler v. Ratner*, 662 N.Y.S.2d 696 (City Ct. City of New Rochelle, 1997) ("*Butler*"), the landowner plaintiff moved for summary judgment on a trespass claim asserted against the defendant process server, not a peace officer, who despite having previously been told three times not to enter the plaintiff's property did so anyway in an attempt to serve the plaintiff with papers.  *Butler*, 662 N.Y.S.2d at 696.  The defendant maintained that because the papers the defendant attempted to serve pertained to a legal action commenced by the plaintiff, the defendant was authorized to enter the plaintiff's property to serve the papers and the plaintiff was without any legal basis to oppose the service.  *Id.* at 696-97.  The court held the mere fact that New York's Civil Practice Laws and Rules 2241(b) permitted the manner of service the defendant was attempting did not create a legal right to trespass, particularly where other methods of service were available.  *Id.* at 697-98.   Similarly, in the instant case, although Defendant Deputy Hoock's initial entry onto the subject Willis Road

premises was privileged because Hoock, despite his employment as a law enforcement officer, was acting in his capacity as a process server for the Sheriff's civil department, once Brian directed Hoock to leave the premises, the process serving privilege was revoked and no longer shielded Hoock from liability as a trespasser. Although Defendants attempt to vest Hoock's decision to remain on the Willis Road premises with additional justification as a law enforcement officer upon viewing Raymond gesturing with large pliers and directing verbal threats at expletives at Hoock, Defendants' Memorandum at 21-22, crucially, Hoock's own testimony at trial was that Brian told Hoock more than once, and possibly more than five times to leave *before* Hoock observed Raymond with pliers. TR3 at 91. It is simply implausible that Hoock, upon being told five times to leave the premises, and whose process serving training included distinguishing between serving process and trespassing, could have believed his continued presence at the premises remained within the privilege for service of process and no reasonable juror, on this evidence, could find otherwise. This conclusion also is consistent with Judge Skretny's determination on summary judgment that but for establishing the element of ownership and possession of the Willis Road premises, summary judgment could have been granted to Plaintiffs on this claim. *See* Summary Judgment D&O at 33-34.[6]

The instant motion for judgment as a matter of law was filed by Defendants, not Plaintiffs. Nevertheless, because as discussed, Discussion, *supra*, at 12-13, the standard for deciding a Rule 50(b) motion is the same as for summary judgment, the court is permitted to grant summary judgment in favor of the non-movant, so long as the

---

[6] A careful reading of the Summary Judgment D&O establishes there was also, at that time, some confusion as to the premises' correct address, since established as 49 Willis Road.

party against whom judgment is entered has been provided with notice and a reasonable time to respond.  Fed.R.Civ.P. 56(f)(1) ("After giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant . . . .").  Prior to granting summary judgment in favor of a non-movant, the court must assure "that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried."  *Priestly v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011) (observing court may grant summary judgment *sua sponte* after determining "the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." (*quoting Schwan-Stabilo Cosmetics GmbH & Co. v. Pacificlink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir. 2005))).  Before granting summary judgment *sua sponte* in favor of the non-movant, "'[d]iscovery must either have been completed, or it must be clear that further discovery would be of no benefit.  The record must, therefore, reflect the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.'"  *Federal Ins. Co. v. Zurich American Ins. Co.*, 445 Fed.Appx. 405, 407 (2d Cir. 2011) (quoting *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996)).  Furthermore, as discussed, Discussion, *supra*, at 19, Rule 1 requires the court and the parties construe, administer, and employ the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action and proceeding."  Under the instant circumstances, the court finds that granting judgment as a matter of law in favor of Plaintiffs on the trespass claim accords with both Rule 1 and Rule 50(b).

Despite finding Hoock committed a trespass upon the Willis Road premises, the question remains as to which Plaintiffs may recover for such trespass and in what amount. Significantly, trespass is an injury to possession and, as such, an action for trespass may be maintained only by one in actual possession. *Gowanus Industrial Park, Inc. v. Amerada Hess Corp.*, 2003 WL 22076651, at * 12 (S.D.N.Y. Sept. 5, 2003) (citing *Miller v. Long Island R. Co.*, 71 N.Y. 380, 383 (N.Y. 1877) ("The possession, unaccompanied with paper title, requisite to furnish the presumption of ownership sufficient to maintain this action must be actual; nothing less will answer.")). A trespass claim under New York common law requires "an intentional entry onto the land of another without justification or permission." *Marone v. Kally*, 971 N.Y.S.2d 324, 327 (2d Dep't 2013) (citation omitted). Trespass "involves the invasion of a person's interest in the exclusive possession of land," *Copart Indus., Inv. v. Consol. Edison Co. of N.Y.*, 362 N.E.2d 968, 972 (N.Y. 1977), because "possession, not ownership, lies at the root of an action for trespass." *Meadow Point Properties, Inc. v. Nick Mazzaferro & S ons*, 219 N.Y.S.2d 908, 909 (Sup. Ct. Suffolk Co., 1961). As such, "[t]respass being an injury to possession, an action may be maintained therefor by plaintiff as a lessee in actual possession even against his landlord." *Steinfeld v. Morris*, 16 N.Y.S.2d 155, 155 (1st Dep't 1939) (citing *Domhoff v. Paul Stier, Inc.*, 141 N.Y.S.2d 825, 826 (2d Dep't 1913)). *See also Beardslee v. New Berlin Light & Power Co.*, 100 N.E. 434, 437 (N.Y. 1912) ("As against one in possession, an intruder must justify his invasion by virtue of his own title, not by the weakness of the defendant's title. . . . As against a trespasser, it would be immaterial that the plaintiff had no title to the land.") (citing cases). Simply put, generally, "an owner who is out of possession cannot maintain trespass." *Sky Four*

*Realty Co. v. State*, 512 N.Y.S.2d 987, 989 (N.Y. Ct. Cl. 1987) (citations omitted). Although an out-of-possession owner may not sue for trespass, such owner is not "without remedy, but he must show more than the trespass, namely, permanent harm to the property of such sort as to affect the value of his interest." *Id.* In other words, "an action for trespass may be brought by a person in exclusive legal possession at the time of the trespass, and the true owner's proper remedy is in the form of an action for ejectment." *Id.* (citations omitted). Accordingly, it follows in the instant case that the trespass claim may be asserted by Brian, Raymond, and Bernice, who were in actual possession of the Willis Road premises at the time of the events on which the instant action is predicated occurred, but not by Angelene who, although named in the deed as a grantee, was not in actual possession at the time of the trespass, and thus has no action for trespass, nor is any remedy available in the absence of any evidence that Hoock's trespass permanently devalued the 49 Willis Road premises. *See Oatka Cemetery Ass'n v. Cazeau*, 275 N.Y.S. 355, 359 (4th Dep't 1934) (holding no action for trespass lies on the part of an out-of-possession owner whose rights have not been invaded); *Domhoff*, 141 N.Y.S. at 826 ("Trespass is an injury to possession, and action therefor may be maintained by any one in actual possession of land.").

In particular, it is undisputed that the Willis Road premises was jointly owned by Angelene and Brian Wierzbic. TR1 at 9, TR2 at 172. Although legally an owner, however, Angelene was not present and, thus, not in actual possession of the Willis Road premises when the actions of which Plaintiffs complain in the instant action occurred, nor was there any evidence from Plaintiffs of permanent devaluation of the property caused by Hoock to support a trespass claim by Angelene as an owner in

constructive possession.  Accordingly, Angelene did not suffer any "injury to possession" and, as such the trespass claim does not belong to her.  *Sky Four Realty Co.*, 512 N.Y.S.2d at 989. Because the remaining Plaintiffs, including Brian, Raymond, and Bernice, were all present, and thus in lawful possession as a result of Brian's apparent permission for Raymond and Bernice's presence when the relevant conduct occurred, they are parties to the trespass claim and, as such, are entitled to recover damages for the trespass.

"A trespasser may be subject to liability for physical harm done while on the land, irrespective of whether his conduct would be subject to liability were he not a trespasser."  *Costlow v. Cusimano*, 311 N.Y.S.2d 92, 97 (4th Dep't 1970) (citing Restatement of Torts 2d (1965) § 162).  Because "the tort of trespass is designed to protect interests in possession of property, damages for trespass are limited to consequences flowing from the interference with possession and not for separable acts more properly allocated under other categories of liability."  *Id.*  In short, damages for trespass are available only for harm arising directly from the trespass rather than arising as a consequence of acts performed after the trespass.  *Id.*  Furthermore, although Plaintiff Angelene is named in the deed as an owner of the 49 Willis Road premises, Angelene was not present when the trespass occurred and, as such, cannot maintain her action for trespass unless the trespass resulted in some permanent harm to the property affecting the value of the out-of-possession owner's interest.  *Sky Four Realty Co. v. State*, 512 N.Y.S.2d 987, 989 (N.Y. Ct. Cl. 1987).  Because the record is devoid of any indication that Hoock's trespass permanently devalued the Willis Road premises, Angelene cannot maintain her trespass claim.

Here, Plaintiffs seek to recover as damages the costs of tomato plants lost when the tomato plants were not timely planted in the ground and watered, the court costs Plaintiffs incurred in connection with the criminal actions, and emotional distress. Although actual damages for harm may be recovered against a trespasser, such damages are recoverable only insofar as such damages "arose directly from the trespass [and are not] a consequence of acts performed after the trespass." *Costlow*, 311 N.Y.S.2d at 97. Here, the damages Plaintiffs seek for the trespass are not attributable to Defendant Hoock's refusal to immediately leave upon being ordered to do so by Brian and Raymond; rather, such damages are attributable to the threatening conduct of Brian and Raymond insofar as both Brian and Raymond directed a barrage of expletives toward Hoock and Raymond acted in a threatening manner by waiving the large pliers at Hoock, conduct to which both Brian and Raymond testified at trial. It was this conduct that resulted in the arrests of Brian, Raymond, and Bernice, and it was the arrests that prevented the Plaintiffs from planting the tomato plants and caused Defendants to incur the costs of the criminal case that was pursued against them. Nor is the break in the chain of causal events negated by the subsequent acquittal of Bernice on the criminal charges, or the reversal on appeal of the criminal convictions obtained against Raymond and Brian for the criminal charges resulted from affirmative actions undertaken by Plaintiffs who, despite being upset by Hoock's attempted service of process and trespassing, acted as they did in opposing Hoock and the officers, according to their own will. Indeed, based on the evidence at trial, no reasonable jury, based on the evidence at trial, could find otherwise. Accordingly, Plaintiffs may not

recover for the costs of the lost tomato plants, or for any expenses incurred in

connection with the criminal prosecution.

Nevertheless, even when no actual injury to the property owner's possessory

interest is established, nominal damages are presumed from a trespass. *Hill v.*

*Raziano*, 880 N.Y.S.2d 173, 175 (2d Dep't 2009) (citing cases).

> "As the law infers some damage without proof of actual injury from every direct invasion of the person or property of another, the plaintiff is always entitled to at least nominal damages in an action of trespass, . . . . An entry into the land of another constitutes a trespass even though damages are slight or there is no damage, and gives rise to an action for nominal damages. Even the most innocent of trespassers is liable for nominal damages as a minimum."

*Butler v. Ratner*, 662 N.Y.S.2d 696, 698 (City Ct. City of New Rochelle, 1997) (quoting
104 N.Y. Jur.2d, Trespass, § 36 at 484.

Because the court finds, as a matter of law, that Hoock, by failing to immediately leave

the Willis Road premises after being ordered to do so numerous times by Brian on July

2, 2012, Hoock trespassed on the premises, yet the evidence fails to establish Plaintiff

suffered any measurable compensatory damages properly attributable to the trespass,

each of the three Plaintiffs whose actual possession of the 49 Willis Road premises was

trespassed by Hoock, *i.e.*, Brian, Raymond, and Bernice, is awarded $ 1.00 (one dollar)

as nominal damages. *See Butler*, 662 N.Y.S. 2d at 698 (awarding on summary

judgment $ 1 in nominal damages to plaintiff who proved process server trespassed on

property in an attempt to serve papers, but failed to show he suffered any measurable

compensatory damages as a result of the trespass).

Punitive damages based on a trespass to real property are not, however,

recoverable absent evidence "'the trespasser acted with actual malice involving

intentional wrongdoing, or that such conduct amounted to a wanton, willful, or reckless

disregard of the party's right of possession.'" *Arcamone-Makinano v. Britton Property, Inc.*, 67 N.Y.S.3d 290, 294 (2d Dep't 2017) (quoting *Litwin v. Town of Huntington*, 669 N.Y.S.2d 634, 635 (2d Dep't 1998)).  No evidence presented at trial either from Plaintiffs or Defendants could reasonably be found to establish Defendant Hook acted with actual malice, or that Hoock's conduct in refusing to leave when ordered off the property amounts to a wanton, willful, or reckless disregard of Plaintiffs' right of possession. *See*, *cf.*, *Butler*, 662 N.Y.S.2d at 698 (holding that the defendant's conduct in trespassing upon the plaintiff's property in an attempt to serve process despite being told three times not to do so, "while improper, did not rise to the level of 'actual malice,'" nor "was 'tantamount to a wanton and willful or reckless disregard of plaintiff's rights.'" (quoting *MacKennan v. Jay Bern Realty Co.*, Inc. 291 N.Y.S.2d 953, 953 (2d Dep't 1968)).

Nor may Plaintiffs recover for emotional distress damages as Plaintiffs had requested caused by the trespass.  In the absence of physical injuries, recovery for emotional distress may generally be had only where one's physical safety is threatened by the tortfeasor's conduct.  *See Jensen v. L.C. Whitford Co., Inc.*, 562 N.Y.S.2d 317, 318 (4th Dep't 1990) (affirming that wife could not recover for emotional distress caused by defendant's destruction of her property when wife's safety was never physically endangered, and citing *Bovsun v. Sanperi*, 461 N.E.2d 843, 847-49 (N.Y. 1984)).  In particular, not only did the asserted distress arise not as a result of Hoock's trespass, but as a consequence of Plaintiff's conduct after the trespass, thus breaking any causal connection between the trespass and the asserted injuries, *Costlow*, 311 N.Y.S.2d at 97, but the recovery for injury to reputation and for emotional support sought by

Plaintiffs in the instant case is more properly attributable to an interference with rights of a personal nature, rather than for interference with their rights to exclusive possession of property. *See Costlow*, 311 N.Y.S.2d at 97 (holding plaintiffs who brought trespass claim against defendant photographer who entered plaintiffs' home to photograph deceased children for publication could not recover for damages for injury to reputation or for emotional disturbance because such damages were not recoverable as a natural consequence of the trespass). Here, as discussed above, Discussion, *supra*, at 27-28, the emotional injury damages Plaintiffs seek are attributable not to Hoock's trespass but, rather, to the ensuing arrests and criminal prosecution. Accordingly, no recovery for injury to reputation or emotional disturbance may be had on the facts presented in this case.

Judgment as a matter of law therefore should be GRANTED on the trespass claim as to Plaintiffs Brian, Raymond, and Bernice, to whom nominal damages of $ 1 each are awarded; Angelene, despite being a legal owner of the Willis Road premises, is not entitled to even nominal damages for the trespass because she was not in actual possession of such premises when the trespass occurred.

**4.      § 1983 Claims**

Insofar as Plaintiffs claim they were arrested without probable cause and subjected to excessive force in the making of such arrests, such claims are for violations of their civil rights under 42 U.S.C. § 1983, which "allows an action against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and the

laws.'" *Patterson v. County of Oneida, New York*, 375 F.3d 206, 225 (2d Cir. 2004)

(quoting 42 U.S.C. § 1983). Section 1983, however, "'is not itself a source of

substantive rights.'" *Id.* (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).

Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere

conferred' . . . ." *Id.* Further, it is basic that liability under § 1983 requires a defendant's

personal involvement in the alleged deprivation of a federal right. *See Warren v. Pataki*,

823 F.3d 125, 136 (2d Cir. 2016) ("To establish a section 1983 claim, 'a plaintiff must

establish a given defendant's personal involvement in the claimed violation in order to

hold that defendant liable in his individual capacity.'" (quoting *Patterson v. County of*

*Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004))).

The elements of a § 1983 claim include (1) the deprivation of a federal

constitutional or statutory right, and (2) by a person acting under color of state law.

*Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (citing *Gomez v. Toledo*, 446 U.S. 640

(1980)). Thus, "[t]he first step in any such claim is to identify the specific constitutional

right allegedly infringed." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989); and

*Baker*, 443 U.S. at 140). In the instant case, Plaintiffs Raymond and Brian allege they

were unlawfully arrested and subjected to excessive force in violation of their Fourth

and Fourteenth Amendment rights.

### A. Qualified Immunity

As discussed, Discussion, *supra*, at 14-15, Defendants maintain that Hoock is

qualifiedly immune from liability with regard to Plaintiffs' false arrest and excessive force

claims under § 1983. "Qualified immunity shields 'government officials from liability for

civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). "Qualified immunity thus affords government officials 'breathing room' to make reasonable – even if sometimes mistaken – decisions, and 'protects all but the plainly incompetent or those who knowingly violate the law' from liability for damages." *Id.* Rather than an affirmative defense, "[q]ualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Saucier v. Katz*, 553 U.S. 194 (2001)).

"Whether qualified immunity applies in a particular case 'generally turns on the objective legal reasonableness' of the challenged action, 'assessed in light of the legal rules that were clearly established at the time it was taken.'" *Distiso*, 691 F.3d at 240 (quoting *Messerschmidt*, 565 U.S. at 546). "An officer is entitled to qualified immunity if '*any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful.'" *Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d 65, 70-71 (2d Cir. 2018) (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (italics in original)). Here, that the warrantless arrests challenged by Plaintiffs had to be supported by probable cause was settled law at the time of such arrests. *See Singer*, 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). Similarly, for Hoock to be qualifiedly immune from liability on the excessive force claims, the amount of force Hoock used in subduing and arresting Plaintiffs must have been objectively reasonable. *See Muschette ex rel. A.M.*, 910 F.3d at 70-71 (holding police officer entitled to qualified immunity on excessive force claim based on

use of a taser to subdue and arrest deaf student following incident at school under circumstances including student had fled dorm and hunkered down in restricted construction area holding large rock, officer was informed student had thrown folding chair at staff member and hurled rocks at teacher, after verbally warning student officer observed staff members using sign language to communicate the warning to the student, who appeared to ignore the officers' instructions and warning).

"'Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact.'" *Manganiello*, 612 F.3d at 164 (quoting *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007)). "The factfinder must determine any disputed material facts, and on the basis of the facts permissibly found, the court must decide 'whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct.'" *Id.* "[T]he doctrine shields officers from suit for damages if 'a reasonable officer could have believed' his action 'to be lawful, in light of clearly established law and the information he possessed.'" *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (further citation and quotation marks omitted)). "That is, '[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context.'" *Id.* (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (further citation and quotation marks omitted)). As relevant here, in *Manganiello*, the Second Circuit, following jury trial, affirmed the trial court's denial of the defendant police detective's motion for judgment as a matter of law on false arrest and malicious prosecution claims based on

the jury's determination that the defendant misrepresented evidence to the prosecutors, failed to pass on material information, or knowingly made false statements such that no reasonable officer could have believed the defendant's actions to be lawful under clearly established law. *Manganiello*, 612 F.3d at 165. In contrast, the Second Circuit reversed the district court's denial of summary judgment on qualified immunity grounds on an excessive force claim under circumstances in which a police officer used a taser to subdue and arrest a deaf school student who had fled the dorm and hunkered down in restricted construction area holding large rock, the officer was informed student had thrown a folding chair at a staff member and hurled rocks at a teacher and, after verbally warning the student, the officer observed staff members using sign language to communicate the warning to the student who appeared to ignore the officer's instructions and warning. *Muschette ex rel. A.M.*, 910 F.3d at 70-71. The Second Circuit specifically held that under the circumstances, it was objectively reasonable for the police officer to believe his use of a stun gun on the deaf student did not constitute excessive force. *Id.*

## B. False Arrest

Defendants argue in support of their motion for judgment as a matter of law that no reasonable jury could find, based on the evidence adduced at trial, other than that the arrests of both Raymond and Brian were supported by at least reasonably arguable probable cause such that Hoock is qualifiedly immune from liability for any unlawful arrest, and that Hoock was not personally involved in Brian's arrest. Defendants' Memorandum at 5-6. In opposition, Plaintiffs argue Hoock subjected both Brian and Raymond to warrantless arrests, neither of which was based on probable cause, and

that the circumstances under which the arrests occurred fail to support qualified immunity.  Plaintiff's Response at 10-17.  In further support of their motion for judgment as a matter of law, Defendants maintain the Plaintiffs' probable cause argument is inapplicable to the facts of this case and is a vain attempt to "inject the 'fruit of the poisonous tree' analysis into this case."  Defendants' Reply at 5.

A § 1983 claim for false arrest requires the plaintiff establish that "the defendant intentionally confined him without his consent and without justification."  *Dufort v. City of N.Y.*, 874 F.3d 338, 347 (2d Cir. 2017) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  The essence of a Fourth Amendment violation based on false arrest is an unlawful restraint on physical liberty.  *Martinsky v. City of Bridgeport*, 504 Fed.Appx. 43, 46 (2d Cir. 2012) (to prevail on a false arrest claim, civil rights plaintiff must show defendant law enforcement officer "unlawfully restrained his physical liberty").  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest . . . ."  *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852).  *See Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) ("Probable cause is a complete defense to a constitutional claim for false arrest . . . ." (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995))).  Further, "the probable cause inquiry may precede any inquiry into qualified immunity because there cannot be an allegation of a constitutional violation where probable cause justifies an arrest and prosecution."  *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (citing *Panetta v. Crowley*, 460 F.3d 388, 394-95 (2d Cir. 2006)).  Where, however, the defendant was not personally involved in a plaintiff's false arrest, it is unnecessary to address whether the defendant lacked probable cause or was

nevertheless qualifiedly immune. The court thus turns to whether Hoock had probable cause to arrest Brian or Raymond for any of the crimes with which they were charged and was personally involved, for § 1983 purposes, in their arrests.

"Probable cause exists when 'the facts and circumstances within . . . the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" *Kass v. City of N.Y.*, 864 F.3d 200, 206 (2d Cir. 2017) (quoting *Marcavage v. City of New York*, 689 F.3d 98, 109 (2d Cir. 2012)). To determine whether probable cause exists, the court must "look at the facts as the officers knew them in light of the specific elements" of the offense, *Gonzalez*, 728 F.3d at 155, considering the totality of the circumstances and "the perspective of a reasonable police officer in light of his training and experience." *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008). "'[P]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful. It therefore is of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation.'" *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012) (quoting *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989)). Accordingly, in the instant case, that the initial conviction eventually was reversed by the County Court Judge on appeal does nor bear on whether the arrests challenged here were in violation of Plaintiffs' civil rights. *See Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 128 (2d Cir.1997) (upholding district court's grant of qualified immunity in favor of defendant police officer on § 1983 claim, stating, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and

eliminate every theoretically plausible claim of innocence before making an arrest." (citing cases)); *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir.1989) ("probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful"). Here, the evidence at trial establishes Hoock was not personally involved in Brian's arrest, and that it is reasonably arguable that Hoock had probable cause to arrest Raymond for the crime of menacing in the third degree such that Hoock is qualifiedly immune from liability for Raymond's arrest which occurred under circumstances supporting arguable probable cause.

### 1.    Brian

Defendants argue in support of their motion for judgment as a matter of law that Defendant Hoock never arrested Brian and thus was not personally involved in any deprivation of civil rights in connection with Brian's arrest. Defendants' Memorandum at 6-10. In opposition, Plaintiffs argue that Hoock's actions amounted to a seizure of Brian, especially in light of Hoock's refusal to leave the Willis Road premises when ordered to do so by Brian. Plaintiffs' Response at 12-14. In further support of their motion for judgment as a matter of law, Defendants argue Plaintiffs fail to point to any facts supporting a seizure of Brian by Hoock, maintaining Plaintiffs' assertion that Hoock's refusal to leave the premises upon Brian ordering him to do so establishes Brian was seized by Hoock is "preposterous." Defendants' Reply at 6-7.

As stated, Discussion, *supra*, at 31, liability under § 1983 requires a defendant's personal involvement in the alleged deprivation of a federal right. *Warren*, 823 F.3d at 136. In the instant case, the facts to which Brian testified at trial establish that Hoock did not arrest Brian because Brian never perceived that his movement was, without his

consent, confined by Hoock, rendering the concepts of both probable cause and qualified immunity irrelevant with regard to Brian's false arrest claim.

In particular, "'not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'"  *DiGennaro v. Town of Gates Police Dep't* 2013 WL 3097066, at * 18 (W.D.N.Y. June 18, 2013) (quoting *United States v. Mendenhall*, 446 U.S. 544, 552 (1980)).  "'[T]he police can be said to have seized an individual 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  *Simon v. City of New York*, 893 F.3d 83, 99 (2d Cir. 2018) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). "'[C]ircumstances that might indicate a seizure' include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'"  *Id.* (quoting *Kaupp v. Texas*, 538 U.S. 626, 630 (2003).  "'As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy [sufficient to constitute an arrest or seizure for Fourth Amendment pusposes].'"  *DiGennaro*, 2013 WL 3097066, at * 18 (quoting *Mendenhall*, 446 U.S. at 554).  Here, Brian's own trial testimony establishes Hoock never asserted the required show of authority over Brian, and that Brian never believed he was not free to leave so as to find Hoock arrested Brian.

Specifically, although Brian testified that Hoock, prior to seizing Raymond, stated that Raymond was under arrest and then advised Brian that he was also under arrest, TR1 at 135-37; TR3 at 188, according to Brian's testimony, after Hoock told Brian he was under arrest, Brian grabbed Hoock's left arm in an attempt to stop Hoock from pursuing Raymond. TR1 at 136-38. Brian explained that because he believed Hoock was trespassing, Hoock had no authority to arrest anyone. *Id.* at 137-38. Brian's trial testimony that he believed Hoock's status as a trespasser rendered Hoock without any rights or authority on the Willis Road premises is consistent with Brian subsequent actions to which Brian testified during cross-examination that establish Brian did not consider himself to be under arrest, including that while Hoock pursued Raymond on foot around the Willis Road premises, Brian's own movement was unimpeded as he stood "watching Hoock for his next move." *Id.* at 140. In response to cross-examination, Brian admitted he "could have gone anywhere you wanted at that point in time," *id.*, including into the house, *id.*, to the road, *id.*, or even "climbed a tree," *id.*, despite Hoock having told Brian he was under arrest. *Id.* Brian's cross-examination testimony is consistent with his direct testimony that, while following Hoock around the Willis Road premises and trying to grasp Hoock's arm to prevent Hoock from reaching Raymond, Brian continuously yelled expletives toward Hoock, demanding Hoock leave the premises. *Id.* at 16-17. Brian opined that Hoock "was an irrational person . . . . He was one of those people that just made demands and yet gave nobody any reason to meet his demands because he just yelled and commanded everything he wanted and expected it. So, because we didn't give him what he wanted, he was just yelling, you're under arrest to everybody," *id.* at 17, further establishing to any reasonable juror that, to

Brian, Hoock's statements were meaningless utterances without consequence to his liberty on the premises at that time. Although Hoock said Brian was under arrest, Hoock did not order Brian to stay in one place, but continued walking at a brisk pace in pursuit of Raymond who was walking deeper into the property away from the road, with Brian following Hoock who was hoping to prevent Hoock from reaching Raymond. *Id.* at 19-20. By the time Hoock finally caught up with Raymond, Brian was 30 feet behind Hoock, *id.* at 21, with Brian attributing the distance to the fact that Hoock ran the final 40 feet to reach Raymond. *Id.* at 23-24. Even after Raymond was pepper-sprayed, Brian freely walked toward the house seeking water to wash the pepper spray residue from Raymond, leaving Raymond with Hoock who then engaged in a physical altercation. *Id.* at 36, 42, 44. These circumstances as testified to by Brian establish that Brian did not submit to Hoock's authority, nor reasonably felt that he was unable to leave. Significantly, the parties do not dispute that it was not Hoock who eventually physically seized and handcuffed Brian, but Deputy Weiss who Plaintiffs have dismissed from the action. TR1 at 36-39, 49, 143.[7] Accordingly, on this record, no reasonable jury could find that Hoock arrested Brian such that judgment as a matter of law pursuant to Rule 50(b) should be GRANTED in favor of Defendants on Brian's § 1983 false arrest claim for lack of Hoock's personal involvement in arresting Brian.

### 2. Raymond

Defendants argue in support of their motion for judgment as a matter of law that the trial testimony of Raymond and Brian establishes Deputy Hoock had the requisite

---

[7] The court notes this is consistent with the Erie County Sheriff's Office Police Report (Dkt. 81-18 at 10), which was not admitted into evidence at the trial, but in which Deputy Weiss is stated to be the law enforcement officer who took Brian into custody.

probable cause to support the qualified immunity defense with regard to Raymond's arrest for menacing in the third degree. Defendants' Memorandum at 10-12. In opposition, Plaintiffs maintain Deputy Hoock was trespassing at the Willis Road premises and thus was without legal justification to arrest Raymond for menacing, a crime for which the trial testimony fails to establish Hoock had probable cause. Plaintiffs' Response at 14-17. Defendants argue in reply that Plaintiffs fails to address that under the doctrine of qualified immunity, Deputy Hoock only needed reasonably arguable probable cause, Defendants' Reply at 4-5, a point which Plaintiffs fail to address, *id.* at 6, relying instead on a "fruit of the poisonous tree" argument which, although relevant to a Fourth Amendment unlawful seizure claim in the context of a criminal action, is inapplicable in the context of a § 1983 civil rights claim. *Id.* at 5.

Preliminarily, the court addresses the effect of Hoock's status as a trespasser on the validity of the subsequent arrest of Raymond. Despite determining that Hoock, by failing to immediately leave the 49 Willis Road premises after being directed to do so by Brian, became a trespasser, the trial testimony establishes that Raymond's conduct in waving a pair of large pliers in a threatening manner at Hoock, accompanied by repeatedly yelling foul language and directing expletives toward Hoock in a hostile manner engaged in the crime of menacing in the third degree under New York law, for which Raymond was convicted by the Aurora Town Court, such that Hoock's presence was no longer solely that of a trespasser, but as an Erie County Deputy Sheriff threatened with physical harm, in which capacity Hoock then acted in arresting Raymond. *See* N.Y. Penal Law § 35.27 (McKinney 1980) (New York's "no-sock" law providing "[a] person may not use physical force to resist an arrest, whether authorized

41

or unauthorized, which is being effected or attempted by a police officer or peace officer when it would reasonably appear that the latter is a police officer or peace officer."). *See also cf., McKnight v. Vasile*, 2018 WL 4625549, at *3 (W.D.N.Y. Sept. 27, 2018 (fact that § 1983 plaintiff's arrest was illegal for lack of probable cause did not permit the plaintiff to resist arrest). Simply, under New York law, a trespasser is not without the protection of the New York Penal Law. *See*, *e.g.*, *People v. Cox*, 707 N.E.2d 428, 474-75 (N.Y. 1998) (upholding trial court's refusal to instruct jury that under N.Y. Penal Law § 35.20(3), a personal in possession of a dwelling may use deadly force against a burglar where the evidence did not support defendant's argument that deadly force was necessary to prevent an assault by the burglar). Moreover, as Defendants maintain, Defendants' Reply at 5, Plaintiffs' argument that absent an "articulable basis to suspect foul play," which was not present in light of Hoock's unsuccessful attempt to serve civil process and the subsequent conversion of Hoock's status to trespasser after Hoock failed to leave the Willis Road premises in accordance with Brian's repeated commands, in actuality seeks to nullify Raymond's subsequent arrest as resulting from Hoock's trespassing on the premises. The so-called "fruit of the poisonous tree" doctrine, however, "is an evidentiary rule that operates in the context of criminal procedure." *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir.1999) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963); and *Costello v. United States*, 365 U.S. 265, 280 (1961)). "The doctrine is an extension of the long-recognized exclusionary rule, and as such has generally been held 'to apply only in criminal trials.'" *Id.* (citing *Segura v. United States*, 468 U.S. 796, 804 (1984), and quoting *Pennsylvania Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 364 n. 4 (1998)). As such, although

the apparent basis for the County Court's reversal of Plaintiffs' criminal convictions, the

doctrine "is inapplicable to civil § 1983 actions," *Townes*, 176 F.3d at 145, and Hoock's

status as a trespasser at the Willis Road premises does not negate any probable cause

supporting Raymond's arrest to establish § 1983 liability.

Further, because Defendants' Rule 50(b) motion for judgment as a matter of law

is premised on the qualified immunity affirmative defense, Defendants need establish

only that the evidence at trial supports that Hoock arguably had probable cause to

arrest Raymond for the crime of menacing in the third degree. *See Jenkins v. City of

New York*, 478 F.3d 76, 87 (2d Cir. 2007) (stating, in defining "arguable" probable

cause, that "[t]he essential inquiry in determining whether qualified immunity is available

to an officer accused of false arrest is whether it was objectively reasonable for the

officer to conclude that probable cause existed."). In New York, the crime of menacing

in the third degree is committed by someone "when, by physical menace, he or she

intentionally places or attempts to place another person in fear of death, imminent

serious physical injury or physical injury." N.Y. Penal Law § 120.15 (McKinney 1992).

The trial testimony contains more than ample undisputed evidence to establish Hoock

arguably had probable cause to arrest Raymond for menacing to support Hoock is

qualifiedly immune.

Specifically, the trial testimony given by both Brian and Raymond supports that it

was objectively reasonable for Hoock to conclude he had probable cause to arrest

Raymond for menacing in the third degree. In particular, Raymond testified that his first

words to Hoock on July 2, 2012, were in response to Hoock's inquiring who Raymond

was with Raymond, then several feet away working on a tractor, yelling, "If you ain't got

an arrest warrant or if you don't have a search warrant, I said get the fuck off the property. I said you've been told to get off the property." TR2 at 83; 101. Raymond admitted Hoock did not use any vulgarities or profanities nor act in a confrontational manner in inquiring who Raymond was. *Id.* at 101-02. When Raymond made this remark, Raymond was holding in his hand a pair of channel lock pliers Raymond had been using to unhook a hose from the tractor. *Id.* at 83-84. According to Raymond, when he made the statement to Hoock, Raymond was gesturing with his hands while holding the pliers and did not comply with Hoock's request that Raymond put down the pliers, *id.* at 85-86, despite Hoock's advising Raymond the pliers presented a safety issue given the pliers could be used as a weapon, *id.* at 88-89, and Brian, located in close proximity to Hoock, also yelling at Hoock. *Id.* at 93-94, 104. It was only after Raymond refused to put down at Hoock's request the pliers and continued yelling expletives at Hoock, with Brian joining in the yelling, that Hoock advised Raymond he was under arrest, *id.* at 133, following which Raymond turned and with the pliers still in hand angrily stormed away from Hoock, further onto the Willis Road premises, while continuing to yell foul language and waving the pliers, *id.* at 99, 102-05, eventually throwing the pliers into an open toolbox near the barn. *Id.* at 103, 106-07. Raymond's version of the events is consistent with that described by Brian, including that when Hoock first approached the Willis Road premises, Raymond was using pliers while working on a hose connection on the water tank behind a tractor, TR1 at 11, and when Hoock asked Brian the identity of the man near the tractor, requesting Raymond to put down the pliers, Raymond stood up and, in anger, raising the pliers in his hand, yelled that Hoock had no right to be on the property without an arrest or search warrant and to

"get the fuck out of here," *id.* at 13, 118-19, 171, with Brian joining in the heated

exchange for several minutes. *Id.* at 13. Hoock then advised that Raymond was under

arrest, *id.* at 133, 135, 171, and Raymond then turned and stalked away from Hoock,

eventually throwing the pliers into an open toolbox near the barn, and continued to walk

away with Hoock following. *Id.* at 15-16,130. Plaintiffs' argument, Plaintiffs' Response

at 15, that Hoock, who was armed with his service weapon, could not have had a "well-

founded fear" that Raymond, armed only with pliers, posed a threat of "imminent

physical injury," ignores that it was not only Raymond who was yelling and acting in an

aggressive manner toward Hoock, but also Brian who directed foul and threatening

language toward Hoock. Under these circumstances, despite remaining at the Willis

Road premises after being ordered to leave and becoming a trespasser, Hoock, upon

observing Raymond's gesturing with the pliers accompanied by expletives and

threatening language specifically directed to Hoock, arguably had probable cause to

believe that Raymond was intentionally attempting to place Hoock in fear of physical

injury supporting Raymond's arrest for the crime of menacing in the third degree, a

conclusion also reached by the Aurora Town Court in convicting Raymond of this

offense. Accordingly, Defendant Hoock is qualifiedly immune from liability for the

alleged false arrest of Raymond, and Defendants' motion for judgment as a matter of

law pursuant to Rule 50(b) is GRANTED with regard to Raymond's § 1983 claim for

false arrest.

### C. Excessive Force

Defendants argue in support of judgment as a matter of law that Plaintiffs'

excessive force claims must be rejected because the evidence at trial established that

the force used to arrest Brian and Raymond was objectively reasonable in light of the facts and circumstances faced by the arresting officers at the time of the incident. Defendants' Memorandum at 12-13, 15-16, that the only physical contact between Hoock and Brian was initiated by Brian, requiring dismissal of the claim against Hoock for lack of personal involvement, *id.* at 13-15, and that injuries Raymond sustained are *de minimis* and, thus, fail to support the excessive force claim. *Id.* at 16-18. Plaintiffs' entire argument in opposition is, "Plaintiffs claim that all force used against them was excessive because they were illegally arrested and thus their excessive force claims are mostly sub-summed [*sic*] by their Fourth Amendment claims for unlawful search and seizure." Plaintiffs' Response at 17. Defendants maintain Plaintiffs' failure to rebut Defendants' arguments on the excessive force claims establishes Defendants' entitlement to judgment as a matter of law on such claims. Defendants' Reply at 7-8.

"'The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment's 'reasonableness standard.'" *Outlaw v. City of Hartford*, 884 F.3d 351, 366 (2d Cir.2018) (quoting *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015)). "The 'proper application' of this standard 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). The reasonableness determination must include consideration of the fact that law enforcement officers often are forced to make quick decisions under stressful and rapidly evolving circumstances rendering the calculation

of what amount of force is reasonable difficult.  *Graham*, 490 U.S. at 396-97.  Relevant

factors include the severity of the crime at issue, whether the suspect posed an

immediate threat to the safety of the officers or others, and whether the suspect was

actively resisting arrest.  *Brown*, 798 F.3d 100 (citing *Graham*, 490 U.S. at 396).  To

support an excessive force claim, Plaintiffs must establish that Hoock used more than

*de minimis[8]* force.  *Feliciano v. Thomann*, 747 Fed.Appx. 885, 887 (2d Cir. 2019).

"Even conduct that caused some physical pain and resulted in side effects need not be

compensated if a jury finds that such injuries were *de minimis*."  *Ali v. Kipp*, 2016 WL

7235719, at *7 (E.D.N.Y. Dec. 13, 2016) (citing *Kerman v. City of New York*, 374 F.3d

93, 123 (2d Cir. 2004) (denying § 1983 plaintiff's motion for a new trial where despite

prevailing on unlawful seizure claim, the plaintiff's claimed injuries lacked objective

support or credibility and were relatively minor).  Nevertheless, while "not every push or

shove constitutes excessive force," *Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995)

(citing *Graham*, 490 U.S. at 396), a show of force by an officer that is overly

disproportionate to the risk of harm may support a claim for excessive force.

*Gersbacher v. City of New York*, 2017 WL 4402538, at * 11 (S.D.N.Y. Oct. 2, 2017)

(denying defendant police officers summary judgment on plaintiff's excessive force

claim where evidence showed that plaintiff verbally opposed the arrest, but did not

attempt to flee or attack the arresting officer, calling into question whether the forced

used by the arresting officer, which caused relatively minor injuries, was excessive).

The "reasonableness of a particular use of force must be judged from the perspective of

a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Brown*,

---

[8] "*De minimis*" is defined as "trifling" or "negligible."  *De Minimis*, <u>Black's Law Dictionary</u> (10th ed. 2014).

798 F.3d at 100-01. Further, a § 1983 defendant will be qualifiedly immune from liability on an excessive force claim where the defendant's use of force was objectively reasonable under the circumstances. *Muschette ex rel. A.M.*, 910 F.3d at 70-71. In the instant case, the trial evidence establishes judgment as a matter of law should be granted in favor of Defendants on the excessive force claims either because the evidence does not support Hoock's used any force in excess of that required under the circumstances, or that it was objectively reasonable for Hoock to believe under the circumstances confronting him that his use of force did not constitute excessive force such that Hoock is qualifiedly immune from liability on Raymond's § 1983 claim for such use of force.

### 1. Brian

Just as the undisputed evidence at trial established that Hoock was not personally involved with Brian's arrest, requiring dismissal of Brian's false arrest claim against Hoock, the undisputed evidence at trial also fails to establish that Hoock was not personally involved in any physical contact directed toward Brian. In particular, Brian testified at trial that Brian grabbed Hoock's arm in an attempt to prevent Hoock from reaching Raymond, but denied that Hoock used any force against him. TR1 at 130-33. It is also undisputed that Brian was arrested and handcuffed by Deputy Weiss, not Hoock. Absent any conduct by Hoock against Brian, Brian cannot maintain his excessive force claim against Hoock. Accordingly, for lack of Hoock's personal involvement, Defendants' Rule 50(b) motion for judgment as a matter of law is GRANTED as to Brian's excessive force claim.

### 2.     Raymond

Defendants maintain that Raymond cannot recover for any of Hoock's four separate uses of force because each use of force resulted in only *de minimis* injuries, Defendants' Memorandum at 16-17 (citing *Vazquez v. Curcione*, 2013 WL 5408858, at *4 (W.D.N.Y. Sept. 25, 2013)), Raymond's arrest for a crime involving a threat of physical violence justified the use of force, *id.* at 17, Raymond's conduct posed an immediate threat to the safety of the officers and others, *id.* at 17-18, and Raymond actively resisted arrest.  *Id.* at 18.  As stated, Discussion, *supra*, at 46, Plaintiff has not offered any particular argument in opposition to judgment as a matter of law on this claim.  Nor did Plaintiffs enter into evidence any medical records to substantiate Raymond's alleged injuries.  The court's consideration of each of the four uses of force by Hoock against Raymond that Defendants identified in thus limited to the trial testimony.[9]

### a.     Punching Raymond from Behind

Raymond testified that while Raymond, carrying the pliers, walked away from Hoock deeper into the Willis Road premises, Hoock followed Raymond and began punching Raymond in the back and in the back of Raymond's head while trying to grab Raymond's hand in which Raymond held the pliers, TR2 at 107-08, and Brian similarly testified Raymond was still holding the pliers when Hoock punched Raymond.  TR1 at

---

[9] Insofar as Raymond complains the handcuffs were applied too tightly and cut into his wrists which bled as a result TR2 at 21-23, Raymond refers not to his initial arrest at Willis Road, in which Hoock was involved, but to the subsequent transport from the ECHC to Aurora Town Court for arraignment on the criminal charges, at which Hoock was not present.  Accordingly, Hoock was not involved in applying the handcuffs to transport Raymond to Aurora Town Court such that no excessive force claim based on this application of handcuffs to Raymond lies against Hoock in the absence of his personal involvement, a prerequisite for § 1983 liability.

128.  Hoock's punching of Raymond, however, occurred after Hoock advised Raymond

he was under arrest, and while Hoock was attempting to gain control over Raymond

who, by walking away from Hoock and further onto the Willis Road premises, carrying

the pliers, swearing at Hoock, and refusing to comply with Hoock's attempt to arrest

him.  Hoock thus was faced with a defendant to a menacing crime, carrying pliers,

acting in a threatening manner, who was attempting to evade arrest by flight, all of

which support some use of force.  *Outlaw*, 884 F.3d at 366.  Nor does Raymond

attribute Hoock's allegedly punching Raymond in the back and back of the head, and

grabbing Raymond's arm, to even the most minimal injury such that any resulting injury

was, as most, *de minimis* and insufficient to support an excessive force claim under §

1983.  *Boyler v. City of Lackawanna*, 287 F.Supp.3d 308, 323 (W.D.N.Y. 2018) (citing

*Regels v. Giardono*, 113 F.Supp.3d 574, 599 (N.D.N.Y. 2015) ("[A] *de minimis* use of

force will rarely suffice to state a constitutional claim.  Moreover, *de minimis* injury can

serve as conclusive evidence that *de minimis* force was used.")).  Not only was this use

of force insufficient to be considered by any reasonable jury as excessive, but even if

such use of force by Hoock could be construed as excessive, the circumstances

confronting Hoock when using such force establishes it was objectively reasonable for

Hoock to believe the use of force did not constitute excessive force such that Hoock is

qualifiedly immune from § 1983 liability on this claim.  *Muschette ex rel. A.M.*, 910 F.3d

at 70-71.

### b.    Pepper Spray

Raymond claims that after Hoock followed him approximately 350 feet around

the Willis Road premises, Hoock sprayed Raymond, with Raymond yelling in response

he could not believe Hoock pepper-sprayed him and calling Hoock a "faggot fuck." TR2 at 113-14. Because Raymond turned his head away when he saw Hoock with the can of pepper spray, only a small amount of spray hit his face, but it dripped down his neck and back causing such a burning sensation that Raymond changed course and headed toward the garden hose at the side of the house intending to wash off the spray residue. TR2 at 113-121. In contrast, Hoock maintains his pepper spray cannister was nearly empty and the little bit of pepper spray that did emit "just kind of dripped onto the ground," possibly getting on Raymond's sneakers. TR3 at 189-90,192 198. According to Hoock, because Raymond had led them some 300 feet from the road with Brian present, and given Brian and Raymond's behavior, Hoock believed the proactive use of the pepper spray would avoid a more physical altercation which, in Hoock's experience, was likely then coming to a head, TR3 at 205-08, which is consistent with the hostile manner in which Raymond spoke to Hoock. Significantly, in response to questioning whether Raymond was incapacitated by the use of pepper spray, Raymond responded, "Not totally, but it hurt," TR2 at 113, and Raymond also admitted it was not enough to cause Raymond to submit to arrest by Hoock, which Raymond continued to avoid, *id.* at 113-17, such that Hoock's use of pepper spray was not more that a *de minimis* use of force and, thus, insufficient to support an excessive force claim. *Regels*, 113 F.Supp.3d at 599 ("[A] *de minimis* use of force will rarely suffice to state a constitutional claim. Moreover, *de minimis* injury can serve as conclusive evidence that *de minimis* force was used."). Moreover, neither Raymond nor Brian deny that their anger at the situation was both real and obvious, and that both Raymond and Brian were moving deeper onto the Willis Road premises, away from the road, with Raymond seeking to avoid arrest and

Brian seeking to impede Hoock's attempt to arrest Raymond such that no reasonable jury could conclude other than that Hoock's belief that the use of the pepper spray was reasonable under the circumstances with which he was confronted such that Hoock is qualifiedly immune from liability for this use of force.[10]  *Muschette ex rel. A.M.*, 910 F.3d at 70-71.

### c.       Fighting with Hoock While Resisting Arrest

Raymond testified that he, Brian and Hoock were standing in the area of the carport at the Willis Road premises, and when the three additional law enforcement officers arrived at the scene, Hoock grabbed Raymond by the throat and started punching Raymond in the back, and Raymond responded by flipping Hoock onto his back, straddling Hoock, and using his right arm to place Hoock in a headlock on the ground. TR2 at 129-31, 133.  Raymond explained he placed Hoock in the headlock so that Hoock would stop punching him.  *Id.* at 134-35.  Two of the newly arrived officers, Deputies Flowers and Weiss, joined in the melée, choking and punching Raymond in an attempt to pull Raymond off Hoock.  *Id.* at 131-32.  Raymond also admitted that after the other law enforcement officers arrived to assist Hoock, and Raymond was pepper sprayed the second time, hitting Raymond in his face, Raymond continued to resist arrest, stating that he was fighting as if "for [his] life," and it took three law enforcement officers to apply the handcuffs.  TR2 at 143-44.  Accepting Raymond's description of this use of force as accurate, a reasonable jury could only find that any injury inflicted on

---

[10] Nor do Plaintiffs deny that it was a later application of pepper spray by either Deputy Flowers, Deputy Weiss, or Officer Braeuner, but not by Hoock, that hit Raymond squarely in the face, with Raymond testifying he was pepper sprayed three times, including the first time by Hoock, the second time by Deputy Flowers, Deputy Weiss, or Officer Braeuner, and the third time, after Raymond was handcuffed, down the throat by Deputy Flowers.  TR2 at 139-41.

Raymond as a result of Hoock's conduct was *de minimis* which, as stated, Discussion, *supra*, at 49, is insufficient to support an excessive force claim. *Regels*, 113 F.Supp.3d at 599. Any subsequent use of force by Hoock after being placed in the headlock was, on this evidence, justified by the circumstances Hoock encountered at that time. Accordingly, the third use of force was not unconstitutionally excessive, but even if it were, Hoock would be entitled to qualified immunity on this § 1983 claim in light of the circumstances under which Hoock used this force against Raymond. *Muschette ex rel. A.M.*, 910 F.3d at 70-71.

### d.  Repeated "Smashing" of Raymond's Head into Ground

Raymond claims that after he was placed in handcuffs, he ceased resisting arrest, but for ten minutes Hoock "continually smash[ed]" Raymond's head into the ground, TR2 at 148, and the law enforcement officers shot water in Raymond's face at a close distance, with the water going up Raymond's nose and down his throat, creating a drowning sensation such that Raymond could not breathe. TR 2 at 155-57. Although, if true, Hoock would not be qualifiedly immune from liability for use of such force which could only be described as excessive given that Raymond by then, had been handcuffed and subdued, based on the trial evidence no reasonable jury could find that for ten minutes, repeatedly smashed Raymond's head into the ground because the resulting injuries are not consistent with such supposed use of force by Hoock. Specifically, although the area onto which Hoock allegedly smashed Raymond's head was a "stone driveway," TR2 at 150, the only proof of injuries presented to the jury were photographs taken two days later showing some small scratches on Raymond's skin and some discoloration. TR2 at 45, 149-51. Significantly, Raymond's trial testimony

that the discoloration is evidence that his whole face was bruised, TR2 at 151, is flatly inconsistent with Raymond's insistence that Hoock repeatedly smashed the left side of his face onto the stone driveway for ten minutes.[11]  *Id.*  Raymond's recollection is thus inconsistent with a commonsense understanding of the effects on a person's face of such force.  Furthermore, Raymond was transported to ECMC not for any head injuries but, rather, in connection with Raymond's complaints regarding his blood sugar and elevated blood pressure, and there was no trial evidence that while at ECMC Raymond received any wound care or had any cuts or abrasions dressed or bandaged. Accordingly, no reasonable jury could find on this record that after the handcuffs were applied to Raymond, Hoock used physical force against Raymond that resulted in anything more than *de minimis* injuries which, as stated, Discussion, *supra*, at 49, are insufficient to sustain an excessive force claim.  *Regels*, 113 F.Supp.3d at 599.

Finally, although Raymond characterized Defendant Hoock's application of water to his face to provide some relief from the burning sensation resulting from the use of pepper spray as "water boarding," asserting Raymond felt as though he were drowning, the trial transcript establishes, without any objection, that the hose Hoock used was a garden hose that did not have a spray nozzle attached such that even at "full blast," as Raymond claimed, TR2 at 154, the water could only "dribble" out.  TR3 at 200.  As Hoock explained, the hose was placed at the top of Raymond's forehead so that the water would wash into his eyes to relieve the burning sensation.  TR3 at 202.  On this testimony, to which no objection was raised nor any other version presented, no

---

[11] Although not argued by Defendants, the extensive discoloration is more consistent with the second use of pepper spray by either Deputies Flowers or Weiss, but not Hoock, or Officer Braeuner, TR2 at 139-42, which the parties do not dispute hit Raymond in the face.

reasonable jury could find that the force of the water Hoock applied to Raymond was so intense as to cause Raymond to believe he was going to drown, such that the use of force was de minimis. Moreover, given that Raymond admits he desired to wash away the pepper spray residue, TR2 at 154, Hoock's use of the garden hose, unfitted with a spray nozzle, to direct water onto Raymond's face and into his eyes, TR3 at 200, 202, was a sufficiently reasonable use of force under the circumstances as to render Hoock qualifiedly immune from this excessive force claim. *Muschette ex rel. A.M.*, 910 F.3d at 70-71

Defendants' Rule 50(b) motion for judgment as a matter of law thus is GRANTED with regard to Raymond's excessive force claim.

### 5.     Defendant Sheriff Howard

Because liability for the claims asserted against Defendant Sheriff Howard could only be derivative of any liability as to Defendant Deputy Hoock based on the theory of *respondeat superior*, Defendant Howard is vicariously liable for trespass based on Hoock's failure to withdraw after ordered to do so by Brian, but not for false arrest or excessive force. *See Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (vicarious liability is inapplicable to § 1983 suits).

### 6.     *In Limine* Motions

Although the court reserved decision on the three *in limine* motions filed by Plaintiffs and Defendants prior to the start of trial, none of the issues raised in the motions ever arose during the trial. Moreover, because the court is resolving the remaining claims as a matter of law, no retrial is necessary. As such, the three *in limine* motions are DISMISSED as moot.

**<u>CONCLUSION</u>**

Based on the foregoing, Defendants' Motion (Dkt. 136), is DENIED in part as to the trespass claim, and GRANTED in part as to the false arrest and excessive force claims. Plaintiffs are each awarded $ 1.00 (one dollar), as nominal damages on the trespass claim. The Clerk of Court is directed to enter judgment accordingly and to close the file.

SO ORDERED.

*/s/ Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     May 2nd, 2019
               Buffalo, New York